Petitioner's *Ex Parte* TRO Motion and Application for a
Custody Warrant and Request for Scheduling of an Expedited
Hearing

# Exhibit A

Memorandum in Support
(Local Civil Rule 7.04)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

| | | |
|---|---|---|
| Fernando Contreras Alcalá, | ) | Civil Action No.  4:14-cv-04176-RBH-TER |
| | ) | |
| Petitioner, | ) | |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| vs. | ) | **PETITIONER'S *EX PARTE* T.R.O.** |
| | ) | **MOTION AND APPLICATION FOR A** |
| Claudia García Hernández, | ) | **CUSTODY WARRANT AND** |
| | ) | **REQUEST FOR SCHEDULING OF AN** |
| Respondent. | ) | **EXPEDITED HEARING** |
| | ) | |
| In the interest of minors under 16 years old. | ) | (Hague Convention Petition) |
| | ) | |

Father Fernando Contreras Alcalá ("Father") urgently needs emergency equitable relief to prevent Respondent Claudia García Hernández ("Mother"), from further interference with Father's custodial rights over the minor children, F.C.G. and A.C.G.  This emergency relief is authorized by the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 (the "Hague Convention"), and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11611, which provide that this Court may take appropriate measures "to prevent the child's further removal or concealment before the final disposition of the petition."  Hague Convention, art. 7(b); 42 U.S.C. § 1 1604(a).

## FACTUAL BACKGROUND

As set forth in Father's Verified Emergency Petition for Return of Children to Mexico and Issuance of a Rule to Show Cause (filed on October 27, 2014) (the "Verified Petition"), Mother and Father are the parents of F.C.G., born in 2004, and A.C.G., born in 2011.  {Verified Pet. ¶ 10.}  Although Mother and Father were not officially married, they did reside together in a Mexican civil union and were listed as the parents of the Children on the birth certificates.  {*Id.* ¶

13.}  Not only was Father listed as the parent of the Children, but he was also fulfilling that role—working two jobs to provide for the Children, spending time with them, and rearing them. {*Id.* ¶¶ 19-22.}  Because of these facts, it is virtually incontrovertible that the Hague Convention applies here—Father, without consenting or acquiescing to their abduction and removal to the United States, was exercising his legal parental rights over the minor Children, both habitual residents of Mexico for their entire lives.  {*Id.* ¶ 39.}

Around 2005 or 2006, the Children's maternal grandmother, Lorenza Hernández Pérez ("Grandmother"), and maternal aunt, Andrea García Hernández ("Aunt"), illegally entered into the United States.  {*Id.* ¶ 23.}  After settling in Florence, South Carolina, Grandmother and Aunt offered to pay for Mother and the Children to be illegally smuggled into the United States.  {*Id.*} When Mother discussed the option with Father, Father objected, citing the dangers of crossing the border and fearing for the health of the Children.  {*Id.* ¶ 24.}  Father insisted that if the family were to relocate to the United States, it would do so legally.  {*Id.*}  By making it clear that the family would not illegally enter the United States, it cannot be argued that Father consented or acquiesced to the Children relocating with Mother.  {*Id.* ¶ 38.}

Ignoring Father's clear position on the issue, Mother made arrangements without Father's knowledge to illegally smuggle the Children into the United States by way of a "coyote," a Spanish colloquialism for one who illegally participates in human trafficking across the American-Mexican border.  {*Id.* ¶ 23 n.2-3.}  Then, on June 17, 2013, Mother forcibly abducted the Children and absconded to the United States.  {*Id.* ¶¶ 25-26.}  Mother did not as much as tell Father goodbye, or even allow the Children to do so.  {*Id.* ¶ 25.}  Instead, Father was left to find out that the Children had been abducted upon returning home from work.  {*Id.* ¶ 26.}

2

Father notified Mexican authorities of the abduction immediately, and a criminal investigation began on June 18, 2013. {*Id.* ¶ 29.} It was not until August that Father was directed to file a Hague Application with the Mexican foreign secretary, which he filed on August 12, 2013. {*Id.* ¶ 30.} Following receipt of the Hague Application by the United States, the State Department began the process of locating the Children. {*Id.* ¶ 33.} Even with the wealth of resources available to the federal government, the State Department was not able to locate Mother and the Children until around May 2013, likely because of Mother's efforts to evade immigration authorities. {*Id.* ¶ 34.}

By filing his Hague Application with the foreign secretary and the Hague Petition with this Court requesting the return of the Children and the issuance of a Rule to Show Cause, Father has done everything in his power to secure the return of his Children. This Court is the necessary culmination of that process, and is Father's last resort to seek any relief with respect to their return. Father now asks the Court to issue an *ex parte* injunctive relief and a warrant for physical custody of the Children.

## **ARGUMENT**

The Hague Convention is intended "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their *prompt* return to the State of their habitual residence." *Maxwell v. Maxwell*, 588 F.3d 245, 250 (4th Cir. 2009) (emphasis added). To further this intent, courts are called on to preserve the status quo— the return of the children to their home countries for further proceedings. *See Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001) ("the primary purpose of the Hague Convention is 'to preserve the status quo and to deter parents from crossing international boundaries in search of a more

sympathetic court." (citations omitted)).   The Third Circuit has summarized this goal of the Convention thusly:

> The Convention's approach to the phenomenon of international child abduction is straightforward.  It is designed to restore the "factual" status quo which is unilaterally altered when a parent abducts a child and aims to protect the legal custody rights of the non-abducting parent. Thus the cornerstone of the Convention is the mandated return of the child to his or her circumstances prior to the abduction if one parent's removal of the child from or retention in a Contracting State has violated the custody rights of the other, and is therefore, "wrongful."

*Feder v. Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1995) (citing Hague Convention, art. 12). Thus, it is ***not*** the underlying custody case that is at issue under the Hague Convention, but whether the international treaty requires the children to be returned to their home country for further proceedings, custody-related or otherwise.  *Miller*, 240 F.3d at 398.

To accomplish the goal of maintaining the status quo, the Court is empowered to take appropriate measures "to prevent . . . prejudice to interested parties by taking or causing to be taken provisional measures."  Hague Convention, art. 7(b).  These "provisional measures" are available to the court exercising jurisdiction over the action just as if it were the appropriate court under State law—indeed the ICARA requires the court exercising jurisdiction to ensure that the applicable requirements of State law are satisfied.  42 U.S.C. § 11604(b).  Once those requirements are met, the court is permitted to implement all necessary procedures "to prevent the child's further removal or concealment before the final disposition of the petition."  *Id.* § 11604(a).

## I.     Father is entitled to *ex parte* emergency relief.

The Federal Rules of Civil Procedure provide that

> [t]he court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A)

4

> specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1). Consistent with Rule 65 and the exigent circumstances that typically exist in Hague Convention cases, the facts in the Verified Complaint "clearly show that immediate and irreparable injury" will occur to both Father and the Children were this Court not to issue the requested TRO without prior notice to Mother. Furthermore, Father has not sought to give her such notice, as it may only cause Mother to flee from the jurisdiction. {*See* Rule 65(b)(1)(B) Certification (attached as Ex. C).} Thus, the elements of Rule 65(b)(1) are met.

In the Fourth Circuit, the Court's discretionary grant of a preliminary injunction is determined by a four-part test "which requires a court to consider (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest." *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 271 (4th Cir. 2002) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). As explained below in the context of the propriety of issuing a temporary restraining order, all of the elements for *ex parte* injunctive relief are satisfied in this case.

## II. Provisional measures are necessary to prevent Mother from removing the Children from the jurisdiction of the Court.

Federal courts across the country have used the authority granted to them by § 11604 to take provisional measures to ensure that abducted children are not removed from their jurisdiction prior to completion of Hague proceedings. *See*, *e.g.*, *Mauvais v. Herisse*, No. 13-13032-GAO, 2013 U.S. Dist. LEXIS 170901, at *5-6 (D. Mass. Dec. 4, 2013) (prohibiting abductor from removing children from the jurisdiction during the pendency of the proceedings);

*Porter v. Gonzalez*, No. 09-0753, 2009 U.S. Dist. LEXIS 53866, at *3 (M.D. Fla. June 24, 2009) (noting in a case arising under the Hague Convention that child's passport was ordered to be surrendered to the clerk of court and respondent was prohibited from removing minor child from the jurisdiction); *Jenkins v. Jenkins*, No. 08-0037, 2008 U.S. Dist. LEXIS 18347, at *2 (S.D. Ohio Feb. 19, 2008) (ordering respondents to surrender passports and prohibiting them from leaving the jurisdiction of the  court pending resolution of petition under the Hague Convention), *aff'd,* 569 F.3d 549 (6th Cir. 2009); *Suki v. Kovacs*, No. 95-6805, 1995 U.S. Dist. LEXIS 15867, at *2 (E.D. Pa. Oct. 27, 1995) (observing in a case arising under the Hague Convention that "[o]rdinarily, the court would enter an order requiring respondent to surrender her passport [and] to remain in the Eastern District of Pennsylvania pending a resolution of this action . . . .").

The provisional measures authorized by § 11604 are "analogous to a temporary restraining order . . . ." *Dionysopoulou v. Papadoulis*, 2010 U.S. Dist. LEXIS 138357, at *6 (M.D. Fla. Dec. 23, 2010) (citing *McCullough v. McCullough* (*In re McCullough*), 4 F. Supp. 2d 411, 415 (W.D. Pa. 1998)).  Rule 65 of the Federal Rules of Civil Procedure establish the procedure for federal courts to grant temporary restraining orders and preliminary injunctions. Fed. R. Civ. P. 65.  In determining whether or not to grant injunctive relief, the district court must balance the hardships likely to befall the parties if the injunction is, or is not, granted. *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977).  The proper balancing of hardships requires this Court to weigh the relative importance of four factors:

> (1)     the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;
>
> (2)     the likelihood of harm to the defendant if the requested relief is granted;
>
> (3)     the likelihood that the plaintiff will succeed on the merits; and

(4)     the public interest.

*Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997) (quoting *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991)).  Comparing the first two of these factors is the crucial first step in this analysis.  *Blackwelder*, 550 F.2d at 196.

An analysis of these factors establishes that provisional measures are authorized and necessary in this case.

**A.  Father will suffer irreparable injury unless the court orders provisional measures.**

Given that Mother has already wrongfully removed the Children to the United States, there obviously exists a risk that Mother will again abduct the Children and go into hiding. Indeed, there is a substantial possibility that Mother will thwart service of process and refuse to appear before the Court.  Some courts around the country have concluded that this threat alone is sufficient irreparable harm.  For example, in *McCullough v. McCullough*, the Western District of Pennsylvania stated:

> Irreparable harm must also be demonstrated for TRO relief to lie. Were respondent to flee this jurisdiction with the children prior to this court accomplishing a transfer of physical custody, the very purpose of the Convention and the ICARA would be defeated. This, by definition, is irreparable harm.

4 F. Supp. 2d at 416 (issuing warrant for the children to be taken into protective custody).  The ICARA specifically establishes a procedure to avoid this irreparable harm.  Under the ICARA, a court may take appropriate measures "to protect the wellbeing of the child involved or to prevent the child's ***further removal or concealment*** before the final disposition of the petition."  42 U.S.C. § 11604(a) (emphasis added).

A high probability of irreparable injury exists here.  While it is possible that Mother will comply with the summons and voluntarily attend a hearing before this Court, this Court must be

mindful that, given Mother's prior abduction of the Children, the greater probability is that she will ignore the summons and go into hiding, further concealing the Children as she has been doing for the past year.  As explained in the Verified Petition, it was not until months after the involvement of the U.S. State Department, the National Center for Missing and Exploited Children, and other law enforcement agencies, that Father was able to locate Mother and the Children.  {Verified Pet. ¶¶ 33-34.}  This is due to the fact that Mother has likely obtained resources allowing her and the Children to live in the United States illegally, evading capture by local immigration authorities.  These resources have been available to her and her family members, who Father believes have been aiding and abetting Mother's illegal and wrongful abduction of the Children.  {Verified Pet. ¶ 23.}  Based on the facts surrounding her abduction of the Children and ability to avoid detection even by the extensive resources available to the State Department, it is not a stretch of the imagination to believe that Mother has the capability to do so again.  Mother should not be permitted to further escape the mandates of the Hague Convention and the requirements of Mexican law.

Furthermore, the irreparable injury to Father that would be caused by Mother fleeing the jurisdiction would not be felt only by Father, but by the Children as well.

> An abduction can have devastating consequences for a child. "Some child psychologists believe that the trauma children suffer from these abductions is one of the worst forms of child abuse." H. R. Rep. No. 103-390, p. 2 (1993).  A child abducted by one parent is separated from the second parent and the child's support system.  Studies have shown that separation by abduction can cause psychological problems ranging from depression and acute stress disorder to posttraumatic stress disorder and identity-formation issues.  *See* N. Faulkner, *Parental Child Abduction is Child Abuse* (1999-2006), http://www.prevent-abuse-now.com/unreport.htm (as visited May 13, 2010, and available in Clerk of Court's case file).  A child abducted at an early age can experience loss of community and stability, leading to loneliness, anger, and fear of abandonment.  *See* Huntington, *Parental*

> *Kidnapping: A New Form of Child Abuse* (1984), in American
> Prosecutors Research Institute's National Center for Prosecution of
> Child Abuse, Parental Abduction Project, Investigation and
> Prosecution of Parental Abduction (1995) (App. A). Abductions
> may prevent the child from forming a relationship with the left-
> behind parent, impairing the child's ability to mature.

*Abbott v. Abbott*, 560 U.S. 1, 21-22 (2010).

Under these facts, provisional measures are authorized by the Hague Convention. *See* 42 U.S.C. § 11604(a). Because of the real possibility that Mother will remove the children from this jurisdiction with the aid of other members of her family—who are here illegally and are spread across the country—satisfies the "irreparable injury" prong for injunctive relief under Rule 65.

### B. The threatened injury to Father and the Children outweighs whatever damage an injunction may cause Mother.

In *Miller v. Miller*, the Fourth Circuit articulated a legal principle that is relevant to this element of injunctive relief when it stated that the remedies under the Convention are "meant both to preserve the status quo with respect to child custody and to deter parents from crossing international boundaries in search of a more sympathetic court." *Miller*, 240 F.3d at 398.[1] This analysis applies here. Father is not seeking a permanent custody order from this Court. He is only seeking the ability to determine custody where it should have been properly determined in the first instance—in Mexico, the state of the Children's habitual residence. Furthermore, by not asking this Court for a custody determination, as is prohibited by the Hague Convention, Mother does not stand to lose any custody rights in the event that this Court grants the requested relief. *Abbot*, 560 U.S. at 20 ("Ordering a return remedy does not alter the existing allocation of

---

[1] *See also Furnes v. Reeves*, 362 F.3d 702, 717 (11th Cir. 2004) (stating that Convention remedies "effectively maintain the status quo with regard to custody . . . . A return order will not effect a change in custody . . . because [Mother] is free to accompany her child back to Norway and retain custody . . . . The specific purpose of the Hague Convention was to deter and amend the exact type of abduction in this case, not to bless it"), *abrogated on other grounds by Lozano v. Montoya Alvarez*, -- U.S. --, 134 S. Ct. 1224 (2014).

custody rights, but does allow the courts of the home country to decide what is in the child's best interests.   It is the Convention's premise that courts in contracting states will make this determination in a responsible manner." (citations omitted)).   Indeed, Mother is free to return to Mexico to live with Father and the Children.   *See Antonio v. Bello*, No. 04-12794-GG, 2004 U.S. App. LEXIS 18334, at *9 n.4 (11th Cir. June 10, 2004) (per curiam) (noting that the irreparable harm by the abducting parent "is <u>not</u>, as Appellant suggests, that she will lose her child.   The return order does not effect any change in custody since Appellant is free to accompany [the child] back to Mexico and assert her custody rights there.").

Mother is in no position to complain.   Having abducted the children and, through her unilateral, unauthorized conduct, illegally smuggled them into the United States, she left Father with no choice but to pursue these remedies.   Regardless, however, any temporary harm felt by Mother is outweighed by the irreparable injury to Father and the Children if Mother were to abduct the Children once again.

**C.   There is a substantial likelihood that Father will ultimately prevail on the merits.**

According to the Hague Convention, the removal or retention of a child is wrongful when: (1) a child is removed from a country in which he was a habitual resident immediately before the removal or retention; (2) the removal is in breach of established custody rights as defined by that country; and (3) these custodial rights were exercised (either jointly or alone) or would have been so exercised but for the removal.   Hague Convention, art. 3.   As the report containing the official history and commentary of the Convention states, "the intention [of the Convention] is to protect all the ways in which custody of children can be exercised," and the Convention favors "a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration."   Elisa Perez-Vera, Explanatory Report: Hague

Conference on Private International Law, *in* 3 Acts and Documents of the Fourteenth Session (Child Abduction) 426, 446-47 (1981).

### 1. The Children's Habitual Residence is in Mexico.

"The framers of The Hague Convention intentionally left 'habitual residence' undefined, and intended that the term be defined by the unique facts in each case." *Maxwell*, 588 F.3d at 251 (citing *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004)). "[A] child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Feder*, 63 F.3d at 224. The determination of habitual residence must be made in reference to the child, not the parent and at the point in time immediately before the removal or retention. *Miller*, 240 F.3d at 400 (quoting *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993)).

Federal courts have developed a two-part framework to assist in the habitual residence analysis. *Maxwell*, 588 F.3d at 251.[2] Under this framework, the first question is whether the parents shared a settled intention to abandon the former country of residence. *Id.* (citing *Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001)). This is generally because a young child does not usually have a "settled purpose" independent of that of his or her parents; thus, a court should look to "the settled purpose and shared intent of the child's parents in choosing a particular habitual residence." *Whiting*, 391 F.3d at 550. Importantly, the emphasis is on the shared intentions of both parents *rather than unilateral intentions of one parent*. *Samholt v. Samholt*, No. 1:06CV00407, 2006 U.S. Dist. LEXIS 51649, at *2 (M.D.N.C. July, 26, 2006) (citing *Feder*,

---

[2] Because the first prong is *not* met in this case, Father does not include an unnecessary analysis of the second prong, "whether there was 'an actual change in geography' coupled with the 'passage of an appreciable period of time, one sufficient for acclimatization by the children to the new environment.'" *Maxwell*, 588 F.3d at 251.

63 F.3d at 224) (emphasis added).  "[A] parent cannot create a new habitual residence by wrongfully removing [or retaining] and sequestering a child."  *Miller*, 240 F.3d at 400 (citing *Diorinou v. Mezitis*, 237 F.3d 133, 141-42 (2d Cir. 2001)).  Evidence tending to establish the lack of a shared intent may include the immigration status of the abducted child, especially where that child is not able to remain in the new country legally.  *See Maxwell*, 588 F.3d at 252 n.13 (citing *Mozes*, 239 F.3d at 1082 (finding that a set of parents did not share an intent to abandon Israel and adopt the United States as their children's residence in part because the father and children traveled to the United States with temporary visas only)).

The facts of this case establish that Mother wrongfully removed the Children from the only home they had lived in their entire life—their habitual residence in Mexico.  {Verified Pet. ¶ 16.}  The Children were born in Mexico and, until their wrongful removal, spent the entirety of their life living in Mexico.  {Verified Pet. ¶¶ 15, 16, 18.}  At the time immediately before the wrongful removal and wrongful retention by Mother, Father's oldest son, F.C.G. went to school in Mexico and participated in extracurricular activities there.[3]  {Verified Pet. ¶ 19.}  F.C.G. and A.C.G. were completely settled and integrated into Mexico's life and culture.  {Verified Pet. ¶ 16.}  It was Mother's unilateral intention that the Children no longer live in Mexico—Father never agreed nor acquiesced to their *illegal* immigration into the United States.  {Verified Pet. ¶ 27.}  In fact, Father declined to authorize this, expressing to Mother that he would fear for the Children's lives if they were to illegally enter the United States.  {Verified Pet. ¶ 24, 38.}

Thus, Mexico is the only state of residence, much less the habitual state of residence, of the Children.

---

[3] The youngest son, A.C.G. was not yet old enough for school.

## 2.  Father Has Parental and Custodial Rights.

Another issue is whether the custody rights of the Father have been violated.  This in turn depends on the law of the country or state of the child's habitual residence.  Hague Convention, art. 3.  The Convention states that custody rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."  Hague Convention, art. 3, § 5(a).  As explained by the United States Supreme Court, the provisions of the Hague Convention are to be broadly construed. *Abbott*, 560 U.S. at 19 ("the Convention uses the unadorned term 'rights of custody' to recognize 'all the ways in which custody of children can be exercised' through 'a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration.'"); *see also id*. at 37 (Stevens, J., dissenting) ("The Court also reminds us that the Convention's terms are to be broadly construed.  To be sure, the Convention's leading interpretive authority informs us that the Convention's understanding of what constitutes 'rights of custody' is broad and flexible."); *Furnes*, 362 F.3d at 714-22 (adopting a broad view of custody rights under international law and holding, "it is crucial to note that the violation of a *single* custody right suffices to make removal of a child wrongful").  In fact, the United States Supreme Court has gone so far as to say that even the retention of a *ne exeat* right—the right to prohibit the parent with custody of the child from taking the child out of the jurisdiction—is a sufficient custody right under the Hague Convention.  *See Abbot*, 560 U.S. at 21-22.

As the Children's habitual residence was in Mexico, the issue of "custody" must be addressed under Mexican law.  *Neves v. Neves*, 637 F. Supp. 2d 322, 335 (W.D.N.C. 2009); *see also Whallon v. Lynn*, 230 F.3d 450, 455 (1st Cir. 2000); *Feder*, 63 F.3d at 225; *Ohlander v. Larson*, 114 F.3d 1531, 1541 (10th Cir. 1997) (stating that the Convention was meant, in part, to

lend priority to the custody determination hailing from the child's state of habitual residence).[4]  It

is immaterial that Father and Mother were not married at the time F.C.G. and A.C.G. were born

so long as the local law devolves rights of custody onto Father.  *Sealed Appellant v. Sealed*

*Appellee*, 394 F.3d 338, 343 (5th Cir. 2004) ("When there is no [custody] agreement between

[unwed] parents, courts must apply the laws of the country of the child's habitual residence to

determine if the non-removing parent had "rights of custody" within the meaning of the

Convention.").

As explained in Father's expert witness affidavit, Mexican courts in Oaxaca apply the

doctrine of *patria potestas*.  {Verified Pet., Ex. K, Nuñez Arreola Aff., Sep. 22, 2014.}

> Mexican doctrine of *patria potestad* has its roots in Roman law.  It is derived from the Latin term *patria potestas*, which in Roman law, conveyed absolute and despotic rights of a father over his children, including the right to punish his children even by death.  Patricia Begné, *Parental Authority and Child Custody in Mexico*, 39 Fam. L.Q. 527, 527, 529 (2005).  In today's Mexico, the institution of *patria potestad* "regulates relations between parents and children until the latter reach the age at which they must fend for themselves."  *Id*. at 530.  It is largely governed by the civil codes of Mexican states.  Designed to protect the interest of children, *patria potestad* constitutes the "most comprehensive" right that a parent can exercise over the person and property of his or her minor children.  [Stephen Zamora et al., *Mexican Law* 482 (2004)]; *see also* Begné, *supra*, 39 Fam. L.Q. at 531 ("Parental authority places a series of correlative rights and obligations on the holder of parental authority, such as custody of the minors, the authority to raise them, discipline them, represent them in legal acts, administer their property, feed and care for them, etc." (quoting *Amparo Directo* 2078/1974, Víctor Manuel Martínez Fernández (1975))).

---

[4] Article 31 of the Convention provides that if, in matters of child custody, the State of the child's habitual residence has two or more systems of law applicable in different territorial units, "any reference to the law of the State of habitual residence shall be construed as referring to the law of the territorial unit in that State where the child habitually resides."  Hague Convention, art. 31.  Thus, to be more specific, the law of the Mexican state of Oaxaca applies here.

*Saldivar v. Rodela*, 879 F. Supp. 2d 610, 623-24 (W.D. Tex. 2012); *see also Gavia v. Hernandez*, No. 2:13-cv-00987, 2013 U.S. Dist. LEXIS 165977, at *22-23 (D. Utah Nov. 20, 2013) ("[P]*atria potestas*, which means 'parental authority' . . . is somewhat akin to the American notion of 'legal custody' or decision-making authority for a minor child. In Spanish, 'custodia' refers to what we in the United States would call 'physical custody,' which addresses which parent a child lives with.")

In *Saldivar*, the petitioner requested the Western District of Texas to order the return of her son to Mexico where the child had been habitually resident prior to abduction to the United States by his father. *Saldivar*, 879 F. Supp. at 615. Following a determination by the court that the child's habitual residence had been the Mexican state of Chihuahua, the court analyzed whether the petitioner had sufficient custody rights under the Hague Convention given her separation from her husband. *Id.* at 614. There the court analyzed the Mexican doctrine of *patria potestad* and determined that

> Chihuahua's institution of *patria potestad* gives [the petitioner] both "the right relating to the care of the person of the child" and "the right to determine the child's place of residence" as contemplated under Article 5(a) of the Convention. The Chihuahua Civil Code's provisions governing *patria potestad* expressly give her the rights to live with the child, to provide physical care (guarda) to the child, to educate the child, and to discipline the child.
> . . . .
> Accordingly, the Court concludes that [the petitioner's] rights pursuant to Chihuahua's institution of *patria potestad* are "rights of custody" under the Convention.

*Id.* at 624-26; *see also Vazquez v. Vasquez*, No. 3:13-CV-1445-B, 2013 U.S. Dist. LEXIS 184292, at *64-66 (N.D. Tex. Aug. 27, 2013) (finding "Mr. Nuñez Arreola's testimony and interpretation of the civil code to be logical, reasonable, and convincing" and holding the doctrine of *patria potestad* to be sufficient "rights of custody" under the Hague Convention);

15

*Gavia*, 2013 U.S. Dist. LEXIS 165977, at *23 ("Petitioner's *patria potestas* rights are rights of custody under the Hague Convention."); *Asuncion Mota v. Rivera Castillo*, 692 F.3d 108 (2d Cir. 2012); *Whallon*, 230 F.3d at 455.

Similar to *Saldivar*, Father has *patria potestas* rights with respect to both F.C.G. and A.C.G. Not only is Father listed on the birth certificates for both of the Children, {*see* Verified Pet., Ex. G-J}, but he has guardianship rights as evidenced by the Mother's inability to access F.C.G.'s school records without his consent. {Verified Pet. ¶ 20.} As the biological father of the Children, Father's *patria potestas* rights have devolved upon him by operation of law. Hague Convention, art. 3. Moreover, Father, having much more than a simple *ne exeat* right, has sufficient rights under the Hague Convention to satisfy the second requirement of a *prima facie* case. *See Abbott*, 560 U.S. at 20.

### 3. Father Exercised his Parental and Custodial Rights

Next, Father was exercising his parental and custody rights at the time of the wrongful removal. Hague Convention, art. 3. The Verified Petition establishes this fact, given that both F.C.G. and A.C.G. lived with Father at their familial residence in Cosolapa, Mexico, up until the Children's abduction by Mother. {Verified Pet. ¶¶ 15-16.} Additionally, Father's Verified Petition establishes that he actually exercised these rights by working tirelessly at two jobs to provide for the Children, {Verified Pet. ¶¶ 11, 19}, helping the oldest son with his schoolwork, {Verified Pet. ¶ 19}, and taking both of the Children to church and parks for recreation, {Verified Petition ¶ 22.} Two specific instances of Father exercising his *patria postestas* rights include:

- Being listed as the oldest son's guardian responsible for attending parent-teacher conferences and picking up his report card at school, {Verified Petition ¶ 20}; and

- Taking the youngest child to the doctor the day before the abduction, {Verified Petition ¶ 21.}

Therefore, Father not only possessed sufficient "rights of custody" under Mexican law, but he actually exercised those rights as a responsible and caring father.

### 4. Conclusion as to Father's likelihood of success on the merits.

Father is very likely to succeed on the merits of his Hague Convention claim. It must be noted, moreover, that all Father seeks is the Children's return their home country, so that a custody determination may be made in the proper forum—Mexico. He is not asking this Court to award him permanent custody of the Children, and Mother retains all of her rights to travel back to her homeland and contest custody there.[5]

### D. Provisional Measures, if ordered, would advance the goals of the Hague Convention and, thus, the public interest.

The relief Father seeks is authorized under the Hague Convention. The relief is further consistent with federal and state law implementing the Convention. There can be no public interest objection raised to the relief sought by Father as it is consistent with the United States policy established by Congressional findings in the ICARA. *See* 42 U.S.C. § 11601. The only relevant considerations are whether Father satisfies the requirements of the Hague Convention, as well as the requirements under the Federal Rules of Civil Procedure for the issuance of emergency equitable relief. Those requirements are satisfied here.

---

[5] As is now well-established, the Hague Convention does not allow the district court to consider the merits of any underlying custody dispute, only whether the treaty requires the prompt return of the children to their home country. *Miller*, 240 F.3d at 398 ("Consequently, the scope of a court's inquiry under the Hague Convention is limited to the merits of the abduction claim. As the district court correctly recognized in this action, 'The merits of any underlying custody case are *not* at issue.'" (citations omitted)); *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir. 1998) (finding preservation of the status quo the main inquiry under the Hague Convention).

**III.    The facts necessitate the issuance of an *ex parte* warrant to take physical custody of the Children.**

In addition to the provisional measures discussed above, federal courts have used the authority granted to them by § 11604 to place the children in protective custody during the pendency of the proceedings in accordance with the South Carolina Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") and other state law.[6]  *See Fink v. Walker*, No. 06-cv-807-JPG, 2007 U.S. Dist. LEXIS 1826, at *12-13 (S.D. Ill. Jan. 10, 2007) (citing Illinois UCCJEA provisions as statutory authority for placing abducted child into protective custody because of the "sufficient flight risk" and abducting parent's history of "elusion of both [the petitioner] and the authorities"); *McCullough*, 4 F. Supp. 2d at 416 (issuing warrant for the children to be taken into protective custody); *Trudrung v. Trudrung*, 686 F. Supp. 2d 570, 573 (M.D.N.C. 2010) (citing North Carolina UCCJEA provisions as authority for placing minors in the custody of the petitioning parent during the pendency of the proceedings based on the likelihood that the minor would be removed from the jurisdiction); *Alonzo v. Claudino*, No. 1:06-CV-00800, ECF No. 9 (M.D.N.C. Feb. 9, 2007) (attached as Ex. B) (issuing warrant pursuant to § 11604 and North Carolina's UCCJEA requiring the placement of the child in the custody of The Children's Home of North Carolina); *Judge v. Williams*, No. 4:11-CV-119-F, 2011 U.S. Dist. LEXIS 81129, at *2 n.1 (E.D.N.C. July 25, 2011) (citing North Carolina's UCCJEA); *Christie v. Williams*, No. 1:07-cv-682, 2007 U.S. Dist. LEXIS 53117, at *7 (E.D. Va. July 18, 2007) ("Accordingly, the Court finds that exigent circumstances exist justifying the Court to

---

[6] The requirements of state law must be satisfied if the court orders law enforcement to take physical custody of a child.  42 U.S.C. § 11604(b).  As discussed below, the applicable South Carolina law requirements are satisfied here.  Additionally, the All Writs Act, which supersedes state law, authorizes the court to "issue all writs necessary or appropriate in aid of their respective jurisdictions . . . ."  28 U.S.C. § 1651(a).  The need to keep the Children from fleeing the State during the proceedings is necessary and appropriate for the Court to properly exercise its jurisdiction over Mother and the Verified Petition.

18

authorize the United States Marshal to seize the children without notice to [the abducting parent] and place the children in the appropriate local child protective services agency.").[7]

The abduction in *Fink v. Walker* is almost identical to the present case.  In *Fink*, an unwed father wrongfully abducted his child from Germany.  *Fink*, 2007 U.S. Dist. LEXIS 1826, at *11.  The father picked the child up at school, and absconded to the United States in violation of mother's custody rights, which were granted to her by operation of German law.  *Id*. at *11. Not until after the mother enlisted the help of the German central authority, the National Center for Missing and Exploited Children, and several other law enforcement agencies, did she find that the father was hiding her son in Illinois.  *Id*.  at *11-12.  Relying on § 11604, case precedent in *McCullough*, and the Illinois version of the UCCJEA, the Court concluded that extraordinary relief in the form of a warrant for physical custody was authorized.  *Id*. at 12-13.  The *Fink* court reasoned that the issuance of the warrant was proper to limit the father's ability to flee the jurisdiction in light of his prior abduction of the child and history of eluding the authorities.  *Id*.

North Carolina district courts have applied a similar rationale in *Trudrung*, *Alonzo*, and *Judge*.  There, all three courts cited North Carolina General Statutes Section 50A-311:

> If the court, upon the testimony of the petitioner or other witness, finds that the child is imminently likely to suffer serious physical

---

[7] In a case with a similar procedural posture, the Texas Court of Appeals described the petitioner's use of the UCCJEA in the Hague proceeding as follows:

> The UCCJEA, therefore, provides remedies for a petitioner to thwart the further removal of the child from Texas pending the determination of the Hague Convention petition.  If a petitioning parent believes that the respondent is likely to attempt to flee the jurisdiction before the trial court determines the merits of the Hague Convention petition, he can seek this extraordinary relief either before serving the other parent with the Convention petition or simultaneously with service.

*Livanos v. Livanos*, 333 S.W.3d 868, 880 (Tex. App. 2010).

> harm *or be removed from this State*, it may issue a warrant to take
> physical custody of the child. The petition must be heard on the
> next judicial day after the warrant is executed unless that date is
> impossible. In that event, the court shall hold the hearing on the
> first judicial day possible . . . .

N.C. Gen. Stat. § 50A-311 (emphasis added). The courts then concluded that the state UCCJEA

provisions authorized them, by way of § 11604, to issue a warrant for physical custody of the

abducted children. *Trudrung*, 686 F. Supp. 2d at 573; *Alonzo*, No. 1:06-CV-00800, ECF No. 9 at

2. In fact, the *Alonzo* court placed the minor in the custody of The Children's Home of North

Carolina, a non-profit providing emergency shelter and care for families with children in need of

placement or transition. *Id*.

Just as the court applied the UCCJEA of the state in which the district court was located

in *Fink*, *Trudrung*, *Alonzo*, and *Judge*, the Court here must apply South Carolina's version of the

UCCJEA. Under Section 63-15-370—which is the exact same provision in *Fink*, *Trudrung*,

*Alonzo*, and *Judge*—a court may issue a warrant to take physical custody of a child if there is an

imminent likelihood that a child will be removed from the jurisdiction of the Court.

> If the court, upon the testimony of the petitioner or other witness,
> finds that the child is imminently likely to suffer serious physical
> harm *or be removed from this State*, it may issue a warrant to take
> physical custody of the child. The petition must be heard on the
> next judicial day after the warrant is executed unless that date is
> impossible. In that event, the court shall hold the hearing on the
> first judicial day possible . . . .

S.C. Code Ann. § 63-15-370(B) (emphasis added).

Such is the case here. Not only has Mother already proven herself to be untrustworthy in

her custody of the Children by absconding with the Children against Father's clear wishes, but

she has proven herself capable of enlisting the services of criminals to aid her in violating federal

and international law. {Verified Pet. ¶ 23 n.2.} Additionally, she has proven that she has access

to a network of like-minded individuals helping her to evade the relevant international authorities, including the State Department.  {Verified Pet. ¶¶ 33-34.}  Her use of these criminal resources once suggests that she is capable of doing so again, further hiding the Children from Father.  This is especially true if she is given notice that these proceedings have begun, and that the federal court system possesses the legal authority to require her Children's return to their home country.  Mother has already abducted the Children from their Father once—she should not be allowed to do so again.[8]

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Father asks this Court to grant the following emergency relief, *ex parte*:

(a)    Enter an immediate *ex parte* temporary restraining order prohibiting the removal of the children from the jurisdiction of this Court pending a hearing on the merits of the Verified Petition, and further providing that no person acting in concert or participating with Mother (including Mother's mother, Lorenza Hernández Pérez ("Grandmother"), and Mother's sister, Andrea García Hernández ("Aunt")) shall take any action to remove the child from the jurisdiction of this Court pending a determination on the merits of this case;

(b)    Schedule an expedited hearing as required by section 63-15-370(B) to determine the propriety of keeping the Children in protective custody, and then an expedited hearing on the preliminary injunction, consolidating it with the trial on the merits under Rule 65(a)(2);

---

[8] Although unnecessary under Section 63-15-370, Mother's actions have also established a clear disregard for the welfare of the Children.  {Verified Pet. ¶ 24 n.3.}  Not only did she endanger their lives by illegally smuggling them into the United States, but she did so knowing full-well that her youngest son, A.C.G., was suffering from nausea, vomiting, and diarrhea.  {Verified Pet. ¶ 21.}  Needless to say, traveling the vast distance from the familial home to Florence, SC, itself a thirty-four hour drive, with an infant in that condition would be highly dangerous.

(c)     Issue a warrant under seal seeking physical custody of the Children, directing that any United States Marshal, Federal officer, or State police officer or constable take physical custody of the Children and place them into protective custody with Florence County Department of Social Services to guarantee their attendance at the hearing; and

(d)     Enter an order authorizing the officer designated above to serve Mother with notice of the hearing, the Verified Petition, and the other documents filed by Father in this case.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: _____
Thomas William McGee, III
Federal Bar No. 6876
E-Mail: billy.mcgee@nelsonmullins.com
Matthew A. Abee
Federal Bar No. 11747
E-Mail: matt.abee@nelsonmullins.com
1320 Main Street / 17th Floor
Post Office Box 11070 (29211-1070)
Columbia, SC  29201
(803) 799-2000

*Attorneys for Petitioner Fernando Contreras Alcalá*

Columbia, South Carolina
October 27, 2014