UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Fernando Contreras Alcala, | ) | Civil Action No.: 4:14-cv-04176-RBH |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **FINDINGS OF FACT,** |
| | ) | **CONCLUSIONS OF LAW,** |
| Claudia Garcia Hernandez, | ) | **AND ORDER** |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

This matter is before the Court following a bench trial held on May 11-12, 2015. Having

considered the testimony of the witnesses, the exhibits, and arguments of counsel, the Court issues

the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of

Civil Procedure. To the extent that any findings of fact constitute conclusions of law, or vice-versa,

they shall be so regarded. For the reasons stated below, Petitioner's Verified Petition seeking the

return of the minor children to Mexico is denied.

**Introduction**

This case involves a dispute between two parents, Fernando Contreras Alcala ("Petitioner"

or "Father") and Claudia Garcia Hernandez ("Respondent" or "Mother"), regarding their minor

children, F.C.G., a ten-year-old Mexican national, and A.C.G., a three-year-old Mexican national.

This case was initiated by the Petitioner, the children's father, who filed a Verified Petition pursuant

to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague

Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-

9011, formerly cited as 42 U.S.C. §§ 11601-11611. Petitioner alleges Respondent wrongfully

removed the minor children from their habitual state of residence in Mexico and illegally entered the

United States with the children. Petitioner seeks the return of the minor children to Mexico through the remedies provided under ICARA. Respondent, seeking to remain in the United States with the minor children, challenges Father's petition for return of the children to Mexico and raises several affirmative defenses provided in the Hague Convention.

### Procedural History

Petitioner filed a Verified Petition seeking the return of the minor children to Mexico on October 27, 2014, under the Hague Convention and ICARA, 22 U.S.C. §§ 9001-9011. *See* [ECF #1]. Petitioner alleges that on June 17, 2013, Respondent wrongfully removed the minor children, against Petitioner's wishes, from their familial home in Mexico and brought the children into the United States illegally and without prior notice. Also on October 27, Petitioner filed a motion for temporary restraining order [ECF #5]. In the motion for temporary restraining order, Petitioner sought: 1) a Restraining Order preventing the Respondent from leaving the jurisdiction; 2) a Rule to Show Cause requiring Respondent to appear at a hearing to show cause why the minor children should not be returned to Mexico; 3) the issuance of a warrant for the physical custody of the minor children; and 4) an expedited hearing on the merits of Petitioner's Verified Petition.

The Court held an *ex parte* hearing on Petitioner's motion for temporary restraining order on October 28, 2014, and took the Petitioner's motions under advisement. On October 30, 2014, the Court issued an Order [ECF #15]: 1) requiring Respondent to appear and show cause why the minor children should not be returned to Mexico; 2) preventing Respondent from leaving the jurisdiction; 3) denying Petitioner's request to issue the custody warrant; and 4) scheduling an expedited hearing on Petitioner's request for a preliminary injunction.

The hearing on Petitioner's request for a preliminary injunction was held on November 6,

2014. Respondent was present at the hearing, along with her sister, mother, and boyfriend. On November 7, 2014, the Court issued a Preliminary Injunction Order [ECF #31] prohibiting the removal of the minor children from the jurisdiction. The Court held a status conference on December 9, 2014, to inquire as to the status of counsel for Respondent, who had been unrepresented up until that point. Shortly after the status conference, due to Respondent's indigence, the Court appointed counsel pursuant to 28 U.S.C. § 1915(e)(1).[1] On February 4, 2015, Respondent filed her Verified Answer [ECF #60], which raised three affirmative defenses.

At the request and consent of the parties, the Court issued a Scheduling Order [ECF #66], which set May 11, 2015, as the date for trial. Pursuant to the Scheduling Order, the parties exchanged expert witness designations and voluntarily exchanged documents; however, they stipulated that formal discovery would not be appropriate due to the expedited nature of the Hague Convention proceeding.

On January 5, 2015, the parties filed a joint stipulation of facts and procedural issues for trial. [ECF #54]. As discussed in greater detail below, the facts stipulated to by the parties established Petitioner's prima facie case of wrongful removal under the Hague Convention. Although Petitioner's prima facie case was established by virtue of the joint stipulation of facts, Respondent raised three affirmative defenses to Petitioner's Petition: the well-settled defense, grave risk defense, and the mature child objection.

The parties filed a joint witness and exhibit list [ECF #74] prior to trial. As to the

---

[1]    Petitioner, although indigent and proceeding *in forma pauperis*, was represented by pro bono counsel. Petitioner was represented by Matt Abee and William McGee of Nelson Mullins Riley and Scarborough. Respondent was represented by Nick Lewis and Brendan Barth of Barth Ballenger and Lewis. All counsel are to be commended for their excellent representation, significant time, effort, and energy spent on this pro bono case. Both parties received quality legal representation.

documents referenced on the joint exhibit list, with few exceptions, the parties stipulated to the authenticity and admissibility.

The Court held a bench trial on May 11-12, 2015.  Over the course of the two-day trial, the following individuals testified: (1) Petitioner, who appeared by video-conference pursuant to the Court's Order [ECF #70]; (2) Respondent; (3) Sarahi Herrera Hernandez, sister of Respondent; (4) Andrea Garcia Hernandez, sister of Respondent; (5) Lorenza Hernandez Perez, mother of Respondent; (6) Evelia Ramirez, friend of Respondent from church; (7) Jose Vasquez, Respondent's boyfriend/fiancé; (8) Gustavo Vasquez Maas, father of Jose Vasquez; (9) Mike Rogers, F.C.G.'s current English and Language Arts teacher at St. John's Elementary in Darlington, South Carolina; (10) Valerie McElroy, ESOL teacher at Greenwood Elementary in Florence, South Caroliona; (11) Samantha Gainey, student data manager at St. John's Elementary; (12) Valerie Smith, ESOL director at St. John's Elementary.  On day two of the trial, expressing a desire for the minor children not to be separated, the parties advised the Court that they wished to stipulate that whatever decision the Court made concerning one child would apply to the other child.

In addition to the evidence presented at trial, the Court has reviewed F.C.G.'s forensic interview.  The parties submitted a Motion [ECF #56] proposing that F.C.G. and A.C.G. undergo a forensic interview in lieu of an *in camera* interview or an interview by a Guardian *ad Litem*.  The Court entered an Order of forensic interview [ECF #57], which required the parties to schedule a forensic interview of the Children by a State Children's Advocacy Center.  This Order also outlined the scope of the interview.[2]  Because of his young age, A.C.G. was not interviewed.  F.C.G.'s

---

[2] The Order set forth the following:
"[T]he parties have outlined the following areas to be discussed during the interview:
•    Any past or present, sexual, or psychological abuse and/or harm to the Children, as well as information regarding the Children's living situation

4

interview took place on February 10, 2015.  The parties manually filed a DVD video recording

[ECF #68] of the interview under seal on March 30, 2015.

## **Burden of Proof**

Petitioner alleges Respondent wrongfully removed their minor children from Mexico and

brought them to the United States illegally.  Petitioner is seeking the return of the minor children to

Mexico under the Hague Convention.  Respondent is challenging their return by raising three

affirmative defenses available under Articles 12 and 13 of the Hague Convention: well-settled

defense, grave risk defense, and mature child objection.  A petitioner in an action for the return of a

child under the Hague Convention must establish that the child has been wrongfully removed or

retained by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A).  Upon finding that a child

has been wrongfully removed under the Hague Convention, the Court must return the child unless

_____

in Mexico; however, this should not be construed so as to involve inquiry into the comparative socioeconomic standards of living in the United States versus Mexico.
- The current living arrangements of the Children, including their involvement in school, daycare, church, community, or extracurricular activities, the stability of their environment, their health, their understanding of the English language, their immigration status, their level of education, and their interactions with friends or family members in the locality.
- Any objection the Children have to being returned to Mexico, the grounds for that objection, and the extent to which the children can articulate the reasons for the objection and the understanding of the effect of such an objection.
- The extent to which the Children have discussed the litigation with either parent or their family members, or have otherwise been influenced or coached.

In general, these topics correspond to possible defenses under Articles 12 and 13 of the Hague Convention.  The parties have been careful, however, to narrowly tailor these topics to 'not include any inquiry or determination of the best interests of the Children' as prohibited by the International Child Abduction Remedies Act. *See* 22 U.S.C. § 9001(b)(4)." [ECF #57].

the respondent can establish one of the enumerated defenses.  A respondent challenging the return

of a child must establish the well-settled defense and mature child objection by a preponderance of

the evidence. 22 U.S.C. § 9003(e)(2)(B).  A respondent must establish the grave risk defense by

clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

### FINDINGS OF FACT

1.    Petitioner, Fernando Contreras Alcala, is the father of the minor children, F.C.G. and A.C.G.

Petitioner is a resident of Cosolapa, Oaxaca, Mexico.  F.C.G. is a ten-year-old male and A.C.G. is a

three-year-old male.

2.    Respondent, Claudia Garcia Hernandez, is the mother of the minor children, F.C.G. and

A.C.G.  Respondent is an undocumented immigrant and currently resides with the minor children in

Darlington, South Carolina.

3.    The parties stipulated to the following facts: a) that when the minor children, F.C.G. and

A.C.G., were brought to the United States by Respondent, they were habitual residents of Cosolapa,

Oaxaca, Mexico, as that term is construed under the Hague Convention; b) Petitioner is the father of

the minor children and was exercising his parental custody rights as a father at the time Respondent

removed the minor children from Mexico; c) sometime in 2013, Respondent and Petitioner

discussed the option of illegally immigrating to the United States; d) on June 17, 2013, Respondent

removed the minor children from their habitual residence without Petitioner's consent or

acquiescence; e) Petitioner has sufficient rights of custody under Oaxacan and Mexican law as that

term is used under the Hague Convention and ICARA; f) Respondent entered the United States with

the minor children illegally; g) Respondent nor the minor children had valid passports or visas at the

time they entered the United States or at any time thereafter. *See* [ECF #54].

6

4.    Petitioner and Respondent never married but lived together with the minor children in Cosolapa, Oaxaca, Mexico.  Respondent testified that she met the Petitioner when she was twelve-years-old and Petitioner was twenty-four-years-old.   At the time, Respondent was living with her grandmother and Petitioner's father.  Petitioner's father is Respondent's step-grandfather.  Petitioner and Respondent met when Petitioner came to visit his father.

5.    Although the testimony does not reflect a clear date when Petitioner and Respondent became involved romantically, Respondent testified that she and Petitioner first had sexual relations when she was only twelve years old.  Petitioner was approximately twenty-four years old at the time.[3]

6.    Respondent and Petitioner began living together in September 2003, when Respondent was thirteen years old.  Petitioner testified that Respondent agreed to move in with him.  Respondent testified that Petitioner tricked her into moving in with him and that she only agreed to move in with Petitioner because he agreed that he would move Respondent's younger sister, Sarahi, in with them in Cosolapa, Oaxaca, Mexico.  Once Petitioner and Respondent moved in together, Petitioner refused to bring Sarahi to live with them.

7.    Respondent's older sister, Andrea Garcia Hernandez, testified that after Respondent moved in with Petitioner, Respondent cried to Andrea complaining that life with Petitioner was not the life she thought it would be and that she wanted to come back but she was ashamed of what she had done.  Andrea testified that she went to Petitioner's home on at least two occasions attempting to

---

[3]    Article 243 of the Oaxacan Penal Code provides that "[t]hose who have intercourse with a chaste female of strong moral character who is over the age of twelve and under the age of eighteen by obtaining her consent through seduction or deceit will be punished with four months to four years of imprisonment and a fine of 30 to 60 days' wages.  When the rape victim is a minor under the age of fifteen, seduction or deceit will be presumed in all cases."  Petitioner was never charged with a crime in Mexico in connection to having sexual intercourse with Respondent when she was twelve years old.

retrieve Respondent.  On the first trip, Andrea testified that she went to the house at night and knocked on the door for approximately two hours but that no one answered the door.  Respondent testified that while Andrea was at the gate yelling for them to open, Petitioner covered Respondent's mouth and told her not to say anything.  Andrea testified that she could hear Respondent through the door but no one came to the door.  On her second attempt a few months later, Andrea was able to contact Respondent and brought her back to her aunt's house.  The next day, Petitioner came to the house where Respondent was staying and took her back to his house.  Andrea testified that Petitioner threatened Andrea to stay away.

8.     At the age of thirteen, in February of 2004, Respondent became pregnant with F.C.G., who was born in November 2004.

9.     A.C.G. was born in 2011 when Respondent was 21 years old.

10.     Respondent testified that Petitioner physically abused her on two separate occasions, once while she was pregnant with F.C.G. and another time sometime in 2011 after A.C.G. was born. Petitioner denied ever harming Respondent.  Despite what may have occurred between Petitioner and Respondent, there is no allegation that Petitioner ever abused or harmed the minor children.

11.     Respondent testified that she felt like a prisoner in Petitioner's home.  Respondent testified that she was forced to conduct her business (selling chickens) through the gate around the home and was never allowed to leave the home with both of her children because Petitioner was afraid that she would leave and never return.  Petitioner denied that Respondent was ever treated like a prisoner and testified that the gate remained unlocked and that Respondent was free to come and go as she chose.

12.     Petitioner and Respondent continued to live together with their minor children, F.C.G. and A.C.G., in Cosolapa, Oaxaca, Mexico until 2013, when Respondent began discussing with Petitioner her desire to move, with the minor children, to the United States.  Respondent's mother and two sisters, Andrea and Sarahi, had already moved to the United States, settling in Florence, South Carolina.  Respondent did not move to the United States with her mother and sisters because she was pregnant with F.C.G. and living with Petitioner when her mother and sisters moved.

13.     Since Petitioner did not want to move to the United States, Respondent began preparing to move to the United States with her minor children, with or without Petitioner.

14.     On June 17, 2013, while F.C.G. was at school, Respondent packed a few personal belongings, including the children's birth certificates, and left the home with A.C.G.  Respondent went to F.C.G.'s school and picked him up.  Respondent, F.C.G., and A.C.G. then took a taxi to a relative's home in a neighboring town.

15.      Petitioner made a complaint to the authorities and provided a statement on June 18, 2013. Petitioner told the authorities that Respondent had been telling him that she wanted to move to the United States with the minor children and that her mother, who already lived in the United States, had been making arrangements for the move.  Petitioner completed an Application for Hague Relief on or about August 20, 2013, in which he listed Florence, South Carolina, United States as the minor children's probable location.

16.     Respondent testified that after leaving Cosolapa on June 17, 2013, she, her children, and her uncle drove towards the border, crossed the Rio Grande, and eventually entered the United States on July 2, 2013.

9

17.    Respondent arrived in Florence, South Carolina, with F.C.G. and A.C.G. on August 22, 2013. Respondent's mother and two sisters had previously settled in Florence after entering the United States illegally from Mexico sometime in 2004 or 2005.  Respondent's younger sister, Sarahi, attended and completed elementary school, middle school, and high school in Florence. Respondent's older sister, Andrea, attended and completed middle school and high school in Florence.  The sisters testified that they are participants in the Deferred Action for Childhood Arrivals (DACA) immigration program[4]  and each operate businesses in Florence.  Respondent's mother and sister Andrea co-own a general store.  Andrea also owns a beauty salon and clothing boutique located next to the store she owns with her mother.  Sarahi owns a business that makes gowns and centerpieces for weddings and flower arrangements.

---

[4]    On June 15, 2012, President Obama announced the Deferred Action for Childhood Arrivals program, or DACA.  Under DACA, certain people who came to the United States as children and meet several guidelines may request consideration of deferred action for a period of two years, subject to renewal.  They are also eligible for work authorization. Deferred action is a use of prosecutorial discretion to defer removal action against an individual for a certain period of time. Deferred action does not provide lawful status. A person may request DACA if they: (1) were under the age of 31 as of June 15, 2012; (2) came to the United States before reaching their 16th birthday; (3) have continuously resided in the United States since June 15, 2007, up to the present time; (4) were physically present in the United States on June 15, 2012, and at the time of making their request for consideration of deferred action with USCIS; (5) had no lawful status on June 15, 2012; (6) are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a general education development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and (7) have not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety. *See* http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca .

18.    When Respondent first arrived in Florence, she and the minor children lived with her mother. Within a short time, Respondent enrolled F.C.G. in the third grade at Greenwood Elementary in Florence School District One.  During this time, Respondent worked for her sister and mother.

19.    Respondent and her minor children did not speak English when they arrived in the United States.  Respondent's sisters, Andrea and Sarahi, who had both lived in the United States for years, are fluent in English.  Andrea testified that she helped Respondent register F.C.G. for school. F.C.G. began third grade on September 9, 2013.  A.C.G. was not old enough to attend school at that time.

20.    In January of 2014, in order to have more space, Respondent and the minor children moved out of Respondent's mother's home in Florence and into a mobile home owned by Andrea in neighboring Darlington County, South Carolina.  Upon moving to Darlington, F.C.G. withdrew from Greenwood Elementary and enrolled at Brockington Elementary in Darlington on February 4, 2014.

21.    Respondent met her boyfriend, Jose Vasquez, sometime in 2013.  Mr. Vasquez is also in the United States illegally and does not have work authorization, residency authorization, DACA status, or a driver's license.  Mr. Vasquez moved in with Respondent and the minor children in February of 2014.  The testimony from Respondent's witnesses reveals that Mr. Vasquez and Respondent are involved in a stable, loving relationship and that they eventually plan to marry.  Respondent's older sister described their relationship as loving and very supportive.

22.    F.C.G. finished the 2013-2014 school year at Brockington Elementary.  While enrolled at Brockington during the spring of 2014, F.C.G. was absent from school eight days. Each of these absences was unexcused.  F.C.G. made decent grades and worked with the English for Speakers of

Other Languages ("ESOL") program at the school. Although he began to make progress in the ESOL program, F.C.G.'s English proficiency was graded as "Level 1: Pre-Functional" on the spring 2014 English Language Development Assessment, the State's standardized English proficiency test administered by the school. Additionally, F.C.G. was graded as not meeting the State's testing standards for math and science based on the school's spring 2014 standardized PASS test. The testimony also reflects that neither of these tests were his most recent tests. The results of the spring 2015 examinations were not available at the time of trial. Valerie Smith, the ESOL director at St. John's Elementary, testified on cross-examination that she would not be surprised if F.C.G.'s 2015 test scores were substantially improved from his 2014 scores.

23.    In November of 2014, Respondent, the minor children, and Mr. Vasquez moved into their current home - a mobile home owned by Mr. Vasquez's father in Darlington County. The location of Respondent's current residence required F.C.G. to transfer from Brockington Elementary to St. John's Elementary, also in Darlington. As of the time of trial, Respondent and the minor children continue to reside with Mr. Vasquez and his father and F.C.G. continued to attend school at St. John's Elementary.

24.    F.C.G. transferred to St. John's Elementary in November of 2014. At the time of trial, F.C.G. was still enrolled in the fourth grade at St. John's Elementary. His most recent report card was placed into evidence and shows that he made all As and Bs in the second and third quarter. The first quarter F.C.G. made a C in science and math. Grades for the fourth quarter were not available at the time of trial. While there was testimony that F.C.G. remains enrolled in the ESOL program, the ESOL director Valerie Smith testified that she only meets with F.C.G. for approximately thirty (30) minutes per week. Ms. Smith further testified that the amount of time spent with each child in the

12

ESOL program is based upon her availability and her assessment of the child's needs. Ms. Smith likewise testified that ESOL students in general are given certain accommodations, such as open book tests, the ability to retake tests, and they are essentially graded on a curve. However, Mike Rogers, who is the only fourth grade teacher of F.C.G. to provide testimony at trial, indicated that F.C.G. was in his English and Language Arts classes for approximately two hours per day and was treated no differently than any other non-ESOL student. Specifically, Mr. Rogers testified that F.C.G. was not receiving accommodations, such as open book tests or the ability to retake tests, in his class. Mr. Rogers further testified that he had no difficulty communicating with F.C.G. in English and that F.C.G. got along well with all of the other children in his class. Mr. Rogers further testified that F.C.G. made an A in the third quarter and that he anticipated that F.C.G. would also make an A in the fourth and final quarter of the school year in his English and Language Arts class. Although the ESOL director testified that it may take years for a student to fully comprehend academic language which is necessary for analytical thinking, that testimony is undermined to some extent and the Court cannot ignore the fact that F.C.G. is making As in his English and Language Arts classes without any special accommodations.

25.    Respondent testified that she and the children have consistently attended church at the Torre Fuerte Church. Evelia Ramirez, a member of Torre Fuerte Church, testified that Respondent, Jose Vasquez, and the children attend services almost every Wednesday, Saturday, and Sunday. Ms. Ramirez further testified that she watches F.C.G. and A.C.G. during church services, along with other children of the church, and that F.C.G. and A.C.G. appear eager to learn and get along well with the other children at the church. Respondent testified that she and the children have developed a supportive network of friends through the church.

13

26.     Respondent testified that although she was not authorized to work in the United States, since arriving here she has worked for her family, cooked meals for local construction workers, and worked as a helper at a clothing store.  Respondent testified that she has been consistently employed since arriving in the United States and that she is currently making $360.00 per week.  Respondent concedes, however, that she pays no taxes on this income.  Respondent testified that she is able to meet all of her basic needs.  Respondent's family members testified that they were all able and willing to financially assist Respondent, if needed.

27.     There was testimony regarding the immigration status of Respondent, the minor children and several of the other witnesses.  Respondent, her mother, Jose Vasquez and Gustavo Vasquez Maas all admitted that they are in the United States illegally and do not have DACA status.  Each of these individuals, however, also testified that they have not become in the past, and currently are not, subject to any deportation proceedings.  Respondent, Jose Vasquez, and Gustavo Vasquez Maas have all been arrested for traffic violations in the past, but all testified that those arrests did not result in any removal or deportation proceedings.  Both of Respondent's sisters, Andrea and Sarahi, testified that they have obtained DACA status and now have work authorization cards and social security numbers.

28.     The Court had the opportunity to review the forensic interview of F.C.G.  F.C.G. communicated throughout the interview entirely in English, with the exception of one word, and without the assistance of the interpreter.  F.C.G. was questioned about several individuals in his life, including Petitioner, Respondent, Jose Vasquez, and Gustavo Vasquez Maas.  F.C.G. initially referred to Jose Vasquez as his dad.  F.C.G. later stated that Petitioner was his father, that Jose was his step-father, and that Gustavo was a step-grandfather.  F.C.G. also stated that he wanted to

remain living in the United States with Respondent.  F.C.G. stated that he did not want to return to

live in Mexico.  When answering questions about life in Mexico, F.C.G. stated that he did not have

many friends, that he was not allowed to have fun, that Petitioner would never play with him, that

Petitioner would never let F.C.G. go outside to play, that Petitioner did not help F.C.G. with his

homework, that he did not have his own bedroom in Mexico, and that F.C.G. did not trust

Petitioner.  F.C.G. also stated that he did not have toys, clothes, or shoes in Mexico.  At times,

F.C.G could be seen fighting through tears when talking about life in Mexico.  F.C.G. stated that

every day was the same when living in Mexico.  When asked about the United States, F.C.G. stated

that he has friends and toys, that Respondent and Jose Vasquez help him with his homework, and

that he has several family members living near him.

29.    As discussed in more detail below, the Court finds that Petitioner has met his burden of proof

for establishing a prima facie case of wrongful removal.  Respondent, however, has met her burden

of proving that the minor children are well-settled in their new environment.  Respondent has not

met her burden of proof with regard to the grave risk defense or the mature child objection.

## CONCLUSIONS OF LAW

1.    This Court has jurisdiction over this case pursuant to 22 U.S.C. § 9003(a) (jurisdiction under

the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction). Venue is proper

pursuant to 22 U.S.C. § 9003(b) and 28 U.S.C. § 1391(b).

**Hague Convention and the International Child Abduction Remedies Act**

2.    The Hague Convention is intended "to protect children internationally from the harmful effects

of their wrongful removal or retention and to establish procedures to ensure their prompt return to

the State of their habitual residence." *Maxwell v. Maxwell*, 588 F.3d 245, 250 (4th Cir. 2009).

Additionally, Courts construe the Hague Convention so as to deter parents from unilaterally removing the children from their habitual residence and crossing international boundaries in search of a more sympathetic court. *See Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001). The Sixth Circuit has explained that these goals are aimed at:

> situations where one parent attempts to settle a difficult family situation, and obtain an advantage in any possible future custody struggle, by returning to the parent's native country, or country of preferred residence. . . . Under such circumstances, the Hague Convention is clearly designed to insure that the custody struggle must be carried out, in the first instance, under the laws of the country of habitual residence . . . .

*Friedrich v. Friedrich*, 983 F.2d 1396, 1402-03 (6th Cir. 1993).

3.    To further the goals of the Hague Convention, courts are called on to preserve the status quo—the return of the child to his home country for further proceedings. *See Friedrich*, 983 F.2d at 1403; *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir. 1998). However, courts cannot issue an order regarding the merits of the underlying custody dispute or to determine the best interests of the child—the only inquiry is whether the treaty requires the prompt return of the child to his or her home country. *Miller*, 240 F.3d at 398.

**Prima Facie Case of Wrongful Removal**

4.    To secure the return of an abducted child under the Hague Convention, a petitioner must prove by a preponderance of the evidence that the child has been "wrongfully removed." 22 U.S.C. § 9003(e)(1)(A). Specifically, the petitioner must establish that: (1) the child was "habitually resident" in the petitioner's country of residence at the time of removal; (2) the removal was in breach of the petitioner's custody rights under the law of his home state; and (3) the petitioner had been exercising those rights at the time of removal. *Miller*, 240 F.3d at 398. Additionally, a

16

petitioner must establish that the children are under age sixteen at the time they are returned.  Hague

Convention, art. 4.  If the Petitioner establishes by a preponderance of the evidence that the removal

of the minor children from Mexico was wrongful, the Court must return the minor children to

Petitioner unless Respondent can establish one of the available defenses under the Hague

Convention. *Miller*, 240 F.3d at 398.  However, under article 18 of the Hague Convention, the Court

retains discretion to order return even if one of the exceptions or defenses is proven. *Id.* at 402;

Hague Convention art. 18.

5.    The parties entered into the following factual stipulations: (1) F.C.G. and A.C.G. were habitual

residents of Cosolapa, Oaxaca, Mexico, as that term is construed under the Hague Convention;  (2)

Petitioner is the father of F.C.G. and A.C.G. as set forth in the children's valid birth certificates; (3)

Petitioner was exercising his parental custody rights as a father at the time Respondent removed

them from Mexico; (4) sometime in 2013, Respondent discussed the option of illegally immigrating

into the United States with Petitioner; (5) on June 17, 2013, Respondent removed the Children from

their habitual residence without Petitioner's consent or acquiescence; (6) Petitioner has sufficient

rights of custody under Oaxacan and Mexican law as that term is used under the Hague Convention

and ICARA; (7) Respondent entered the United States with the children illegally; and (8) neither

Respondent nor the Children had valid passports or visas at the time they entered the United States

or at any time thereafter.  [Dkt. No. 54].  Lastly, it is undisputed that F.C.G. is ten, and A.C.G. is

three – both under the age of sixteen as required by the Hague Convention.

6.    Based on the parties' stipulations, the Court concludes that Petitioner has established, by a

preponderance of the evidence, a *prima facie* case for wrongful removal of the minor children from

Mexico.

**Affirmative Defenses**

7.    Because Petitioner has established a prima facie case of wrongful removal under the Convention, the minor children must be returned to Mexico as their place of habitual residence unless Respondent can establish one of several narrow defenses. *Miller*, 240 F.3d at 398. Respondent argues that three defenses apply here – the well-settled defense, the mature child's objection, and the grave risk defense. The well-settled defense and mature child objection require proof by a preponderance of the evidence, while the grave risk defense requires proof by clear and convincing evidence. 22 U.S.C. § 9003(e).

8.    However, as is clear from ICARA, these affirmative defenses are meant to be narrow. *See Blondin v. Dubois*, 189 F.3d 240, 246 (2d Cir. 1999). Indeed, these defenses "do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody." *Blondin*, 189 F.3d at 246.

9.    Moreover, even where the respondent meets his or her burden to show that an exception applies, the court may nevertheless exercise discretion to order repatriation. Hague Convention, art. 18; *Miller*, 240 F.3d at 402.

10.    As to these affirmative defenses, the Court accepts the stipulation of the parties that the Children are not to be separated. If the Court concludes that one of the defenses discussed below apply to one of the minor children, the parties have stipulated that the defense should also apply to the other child so that the children can remain together.

**Well-Settled Defense**

18

11.    Respondent challenges the return of the minor children to Mexico by invoking the well-settled defense set forth in Article 12 of the Hague Convention.  Article 12 provides that:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.
>
> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.
>
> Where the judicial or administrative authority in the requested State has reason to believe that the child has been taken to another State, it may stay the proceedings or dismiss the application for the return of the child.

Hague Convention, art. 12.

12.    To establish the well-settled defense, Respondent must prove by a preponderance of the evidence that (a) the child is "well-settled" in his new environment and (b) Petitioner initiated judicial proceedings under the Convention more than one year after the wrongful removal. *Belay v. Getachew*, 272 F. Supp. 2d 553, 560-61 (D.Md. 2003).

13.    Petitioner does not dispute that he initiated the present proceedings more than one year after the wrongful removal of the minor children from Mexico.  The key dates under the Hague Convention are the dates of the wrongful removal or detention and the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is located. Hague Convention, art. 12.  Under ICARA, the commencement of proceedings

begins with the filing of a judicial petition. *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1362 (M.D.Fla. 2002) (citing *Wojcik v. Wojcik*, 959 F. Supp. 413, 418-19 (E.D.Mich.1997)).  The minor children were wrongfully removed on June 17, 2013.  Petitioner did not file his petition under the Convention until October 27, 2014.  Petitioner does not dispute that he knew the probable location of the minor children was Florence, South Carolina as early as August 2013.[5] *See* [Joint Trial Exhibit 6 and ECF #1-3, pg. 3].  Accordingly, the Court finds by a preponderance of the evidence that Respondent has established the one-year element of the well-settled defense.

14.    Respondent must still establish that the minor children are well settled in their new environment.   Article 12 of the Hague Convention does not define the term "settled."   However, courts have interpreted it to ask whether "the child is in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects." *In re D.T.J.*, 956 F. Supp. 2d 523, 534 (S.D.N.Y. 2013).  In determining whether the child is well-settled, courts have considered the following non-exhaustive list of factors: (1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church or participates in other community or extracurricular school activities regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and respondent. *Lozano v. Alvarez*, 697 F.3d 41, 57 (2d Cir. 2012), *aff'd*, 134 S.Ct. 1224 (2014).  With respect to immigration status, the importance of this factor has been held to be

---

[5]    Petitioner does not allege that Respondent concealed the location of the children and has not sought equitable tolling of the one-year period necessary to establish the well-settled defense.  The Supreme Court has recently held that equitable tolling is not available under the Hague Convention. *See Lozano v. Montoya Alvarez*, 134 S.Ct. 1224 (2014).

20

relevant only if there is an immediate, concrete threat of deportation. *In re B. Del C.S.B.*, 559 F.3d 999, 1009 (9th Cir. 2009); *In re Lozano*, 809 F. Supp. 2d 197, 232-33 (S.D.N.Y. 2011) (stating there is "nothing to suggest that, at this moment, or in the near future, the immigration status of the child and Respondent is likely to upset the stability of the child's life here in New York").  In most cases, the importance of the child's immigration status will vary based on the likelihood that the child will be able to acquire legal status or otherwise remain in the United States, the child's age, and the extent to which the child will be harmed by her inability to receive certain government benefits. *Lozano*, 697 F.3d at 57.  In any event, immigration status is but one factor to consider in the multi-factor analysis of whether a child is well-settled in his or her new environment.

15.    The Court concludes by a preponderance of the evidence that the minor children are well-settled in their new environment.  The forensic interview of F.C.G. illustrates that he can speak, understand, and converse in English.  F.C.G.'s language abilities are significant evidence of his acclimatization to his new environment given the fact that he could not speak any English when he arrived in August of 2013.  F.C.G.'s current English teacher at St. John's Elementary, Mike Rogers, testified that F.C.G. had a good grasp of the English language and was expected to receive an A in the fourth quarter of the year in English and Language Arts.  A review of F.C.G.'s report card from St. John's Elementary shows that he received all A's and B's except for a C in science and math, which he received at the beginning of the year.  F.C.G. is enrolled in the English for Speakers of other Languages program[6] or ESOL; however, F.C.G.'s English teacher, Mr. Rogers, who was with F.C.G. for two hours each day, testified that F.C.G. had not received any special accommodations of

---

[6]    Participants in ESOL are eligible for certain accommodations in the school setting. For example, they may be given extra time on tests, have the tests read to them, take tests using an open book, or may be able to re-take tests.  F.C.G.'s English teacher at St. John's Elementary testified that F.C.G. did not receive any of these accommodations in his class.

which he was aware.  In addition to F.C.G.'s English language ability, testimony indicated that

A.C.G.'s first words were in English rather than Spanish.

16.    The minor children have substantial family ties in their new environment.  The testimony

presented establishes that the minor children have a significant number of family members in the

area including their grandmother, two aunts (with their respective families), and a number of

cousins.  The minor children have extensive contact with those family members and attend

numerous family gatherings.  The minor children's family has strong ties to the community through

successfully owning and operating local businesses.

17.    The minor children regularly attend church in their new environment and are present almost

every Wednesday, Saturday, and Sunday.  Testimony from a church member indicates that F.C.G.

and A.C.G. get along well with the other children and have friends at the church.

18.    The minor children have friends in their new environment.  Testimony from F.C.G.'s English

teacher at St. John's Elementary indicates that F.C.G. is well-liked by his peers and has a number of

friends in his class.  Evidence was also presented showing the minor children playing outside their

home with other children in their neighborhood.

19.    As noted above, F.C.G. has performed exceptionally well in school receiving above average

grades during his most recent school year.  Testimony from F.C.G.'s ESOL teacher indicated that

she only met with F.C.G. thirty minutes per week implying that F.C.G. did not require significant

ESOL instruction.

20.    Respondent admits that she is in the United States illegally and lacks the legal authorization to

be employed.  Despite those limitations, Respondent has remained gainfully employed and

consistently earned an income since her arrival in the United States.  Respondent first worked in her

mother and sister's shop, then she cooked for local construction workers, and currently works in a clothing warehouse earning $360.00 per week. Respondent is clearly able to provide for the minor children. Testimony from other witnesses indicates that F.C.G. and A.C.G. are provided with adequate clothing, food, and shelter. Respondent's mother and sisters indicated that they would also be willing to help Respondent and the minor children if needed.

21.    The Court finds that Respondent has maintained a stable residence for the minor children in their new environment. Respondent and the minor children first lived with Respondent's mother in Florence County for four to five months after arriving in the United States. In order to have more space, Respondent and the minor children left her mother's residence and moved into a mobile home owned by Respondent's sister, Andrea, in Darlington County, which is adjacent to Florence County. After staying in Andrea's mobile home for eleven months, Respondent and the minor children moved in with Respondent's boyfriend, Jose Vasquez, also in Darlington County. Although Respondent has lived with the minor children in three different locations since arriving in the United States, the moves were within the same geographical region (Pee Dee area of South Carolina) and did not disrupt the minor children's daily lives. The second move was within the same community and school district in Darlington County. Respondent's reasons for moving twice are reasonable and do not reflect an unstable existence for the minor children. Importantly, Respondent has not attempted to conceal the whereabouts of the minor children. The Court concludes that the minor children have a stable home life in their new environment.

22.    The minor children's immigration status is cause for concern, but, as a practical matter, it is highly unlikely that they will face deportation anytime soon. There are no current, imminent, or threatened removal or deportation proceedings. If the past is any indication of the future, it is worth

noting that the minor children's aunts were in the United States illegally and, despite that, graduated from the local public school system attending from elementary school through high school.  Now, both of the minor children's aunts have DACA status and operate local businesses and make positive contributions to the community.  The minor children's grandmother has been in the United States illegally for almost fifteen years and also operates a local business.  Given the length of time the minor children's relatives have remained in the United States illegally, there is nothing to suggest that, at this moment, or in the near future, the immigration status of the minor children is likely to upset the stability of their life in their new environment. *See In re Lozano*, 809 F. Supp. 2d at 233.  Further, there has been no testimony or indication that F.C.G. or A.C.G. are likely to suffer any harm from their inability to receive certain government benefits due to their illegal status.  Testimony indicates that the minor children are well-cared for, have access to medical care, and are supported by a network of family and friends.

23.    While the minor children's immigration status might arguably weigh against a finding of well-settled, immigration status is not dispositive of the issue.  While the children are ten years old and three years old, both children have assimilated themselves into their new environment.  The children's residence has been relatively stable and although they have moved from one house to another, they have remained in the same geographical area in Florence and Darlington County with many extended family members within reasonably close proximity available to assist.  The older child has consistently attended elementary school and done above-average, if not well.  Both children have regularly attended a local church at least twice per week and both have established friendships either at school or in their neighborhood.  Respondent has consistently worked with the help of her extended family members, most of whom are gainfully employed.  Since their arrival the

children have always had sufficient food, clothing, and shelter and extensive family support.  While

Respondent's and the minor children's immigration status is of concern, as a practical matter there

are no current removal or deportation proceedings pending or imminent.  The minor children have

family members who have been here illegally for ten years or more.  The stability of the minor

children's residence, F.C.G.'s school attendance and acclimatization to his school, F.C.G.'s school

performance, the minor children's adoption of the English language, church attendance,

Respondent's employment and financial stability, and the network of family and friends in the new

area outweighs the immigration status of the minor children.  Balancing the relevant factors, the

Court concludes by a preponderance of the evidence that the minor children are well-settled in their

new environment.

**Mature Child Objection/ Age and Maturity Exception**

24.    Respondent raises the mature child objection or age and maturity exception as a defense to the

petition to return the children to Mexico.  Article 13 of the Hague Convention provides that the

Court may decline to order the return of the child if it finds that the child objects to being returned

and has attained an age and degree of maturity at which it is appropriate to take account of its views.

Hague Convention, art. 13.  The respondent must establish the applicability of the mature child

objection by a preponderance of the evidence. 22 U.S.C. § 9003(e).  Although courts have construed

the mature child objection narrowly, *see England v. England*, 234 F.3d 268, 272 (5th Cir. 2000), a

court may refuse repatriation solely on the basis of a considered objection to returning by a

sufficiently mature child. *Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir.2001). A court must apply a

stricter standard in considering a child's wishes when those wishes are the sole reason underlying a

repatriation decision and not part of some broader analysis. *de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007).

25.    In applying the mature child objection, a court must not focus solely on the general goal of the Convention – to protect children from the harmful effects of wrongful removal – but must also carefully determine that the particular child has obtained an age and degree of maturity at which it is appropriate to take account of its views. *Blondin v. Dubois*, 189 F.3d 240, 247 (2d Cir.1999).  The Convention contains no age limit for applying the exception. *de Silva*, 481 F.3d 1 at 1286.

26.    "Given the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate." *Hirst v. Tiberghien*, 947 F. Supp. 2d 578, 596-97 (D.S.C. 2013); *See, e.g. England*, 234 F.3d at 272-73 (reversing district court that had taken a thirteen-year-old child's wishes into account where child had learning disabilities, had had four mothers in twelve years, had attention deficit disorder, took Ritalin, and was scared and confused); *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 208 (E.D.N.Y. 2010) (finding a nine-year-old two months shy of his tenth birthday was hardly sufficiently mature for the Court to take his views into account in deciding whether or not to order his return); *Lopez v. Alcala*, 547 F. Supp. 2d 1255 (M.D. Fla. 2008) (finding that a ten-year-old had reached an age of maturity, but ordering return because the childs fears regarding return were unfounded); *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007) (finding a ten-year-old considered a border-line genius was not of sufficient age and maturity for her views to be taken into account); *Matovski v. Matovski*, No. 06 Civ. 4259(PKC), 2007 WL 2600862 (S.D.N.Y. Aug. 31, 2007) (considering the objections of a twelve-year-old and an eleven-year-old in denying return in conjunction with a finding that the children were well-settled in the place of wrongful retention pursuant to Article 12 of the Convention, but denying return);

*Anderson v. Acree*, 250 F. Supp. 2d 876, 883 (S.D.Ohio 2002) (finding that an eight-year-old child's objection to a return furnished an independent basis for the court not to return the child, but relying also on a finding that the child was well-settled in her new residence for 22 months pursuant to Article 12 of the Convention); *Raijmakers-Eghaghe v. Haro*, 131 F. Supp. 2d 953, 957-58 (E.D. Mich. 2001) (ordering limited discovery including psychological reports and in camera interview to gather enough information to pursue issue of eight-year-old child's wishes); *Tahan v. Duquette*, 259 N.J.Super. 328, 613 A.2d 486, 490 (1992) (holding, without discussion, that the maturity exception simply does not apply to a nine-year-old child).

27.    The court must distinguish between a child's objections as defined by the Hague Convention and the child's wishes as in a typical child custody case. *de Silva*, 481 F.3d at 206.  A child's "generalized desire" to remain in the United States is "not necessarily sufficient to invoke the exception . . ." *Yang*, 499 F.3d 279.  The child must "include particularized objections to returning to" the former country of residence. *Id*.  Where the particularized objection is "born of rational comparison" between a child's life in the new country and the country of habitual residence, the court may consider the child's objections to be a mature objection worthy of consideration. *Castillo v. Castillo*, 597 F. Supp. 2d 432, 441 (D. Del. 2009).

28.    Likewise, the child's preference for one parent over another is insufficient – considering such a preference would place the Court in the position of deciding parental custody, which is prohibited by the Hague Convention and ICARA. *See Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 615 (E.D. Va. 2002) (finding that to accommodate a thirteen-year-old's preference to stay in the United States and spend more time with his father "would be a custody determination that is not at issue in a Hague Convention petition"); *Haimdas*, 720 F. Supp. 2d at 208 ("[Child who was nearly ten years

27

old] sees this as a choice of which parent he wants to live with, not which country he wants to grow up in; his stated preference to remain in New York is not a particularized, mature objection that should be part of the Court's Hague Convention analysis."). Giving consideration to such wishes would place the court in the position of deciding custody which is explicitly not the mandate of a court hearing a wrongful retention case under the Hague Convention.

29.    In this case, the Court reviewed the forensic interview of F.C.G., who was ten years old at the time.  In the interview, F.C.G. expressed an unequivocal desire to remain in the United States. F.C.G. stated that he did not trust the Petitioner and that Petitioner never played with him or helped him with his school work.  F.C.G. complained that he never had any toys in Mexico and had to sleep in a bed with his grandmother (Petitioner's mother).  F.C.G. stated that he wanted to stay in the United States because he had a room, friends, and his own toys.  F.C.G. was polite and well-spoken during the interview.  F.C.G.'s reasons for wanting to remain in the United States, however, do not indicate a level of maturity such that this Court should give his wishes significant weight. The reasons for wanting to remain in the United States must be "born of rational comparison" between his life in the new country and his country of habitual residence. *See Castillo*, 597 F. Supp. 2d at 441.  F.C.G.'s wishes regarding staying in the United States as expressed in the forensic interview are merely preferences for one parent or one lifestyle over another.  F.C.G. has not articulated a particularized, mature objection to returning to Mexico versus remaining in the United States.

30.    Accordingly, Respondent has failed to establish the mature child objection by a preponderance of the evidence.

**Grave Risk Defense**

31.    Respondent also asserts the grave risk defense found in Article 13(b) of the Hague

Convention.  Article 13(b) provides that the Court is not bound to return a child to its habitual state

of residence if "there is a grave risk that his or her return would expose the child to physical or

psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art.

13(b).  Respondent has the burden of establishing the grave risk defense by clear and convincing

evidence. 22 U.S.C. § 9003(e)(2)(A).

32.    The grave risk defense is a narrow one. *Miller*, 240 F.3d at 402.  It has been held that "grave

risk of harm" for purposes of the defense under Article 13(b) can exist in only two situations: (1)

where return of the child puts the child in imminent danger prior to the resolution of the custody

dispute, e.g. returning the child to a zone of war, famine, or disease; and (2) cases involving serious

abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual

residence may be incapable or unwilling to give the child adequate protection. *Friedrich v.*

*Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996).

33.    The grave risk defense "may not be used 'as a vehicle to litigate (or relitigate) the child's best

interests.'" *Charalambous v. Charalambous*, 627 F.3d 462, 468 (1st Cir. 2010) (quoting *Danaipour*

*v. McLarey*, 286 F.3d 1, 14 (1st Cir. 2002)). "Only evidence directly establishing the existence of a

grave risk that would expose the child to physical or emotional harm or otherwise place the child in

an intolerable situation is material to the court's determination." Public Notice 957, 51 Fed. Reg. at

10510.  Furthermore, the Court is not permitted to determine whether one parent would be better

than the other, or whether the environment offered by Respondent is superior to their home

environment. *See Whallon v. Lynn*, 230 F.3d 450, 459 (1st Cir. 2000).  "Courts are not to engage in

a custody determination, so [i]t is not relevant ... who is the better parent in the long run, or whether

29

[the absconding parent] had good reason to leave her home ... and terminate her marriage." *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000). Instead, the respondent must be able to cite specific evidence of potential harm to the individual children. *Rydder v. Rydder*, 49 F.3d 369, 373 (8th Cir. 1995).

34.    It is generally insufficient for a respondent to offer evidence of abuse directed only at the respondent. *Whallon*, 230 F.3d at 460; *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 376-77 (8th Cir. 1995) (holding physical and sexual abuse of mother insufficient to establish grave risk of harm to child). This is especially true if that abuse did not occur in front of the child. *Whallon*, 230 F.3d at 460; *Nunez-Escudero*, 58 F.3d at 376-77. "The grave-risk inquiry should be concerned only with the degree of harm that could occur in the immediate future." *Gaudin v. Remis*, 415 F.3d 1028, 1037 (9th Cir. 2005).

35.    Respondent testified that she was only twelve years old when she first had sexual relations with the Petitioner, who was approximately twenty-four years old at the time. Respondent testified that Petitioner physically assaulted her once while she was pregnant, and again after the children were born. Petitioner denied these allegations. Petitioner was never charged with a crime concerning his conduct or relationship with Respondent. There was no evidence that any reports or complaints were filed with law enforcement alleging that Petitioner engaged in either spousal or child abuse.

36.    There was no testimony that Petitioner ever abused F.C.G. or A.C.G. While Respondent's allegations concerning Petitioner's treatment of her are troubling, there is insufficient evidence that F.C.G. or A.C.G. would be exposed to any physical or psychological harm at the present time, or otherwise be placed in an intolerable situation, if they are returned to Mexico. Respondent has

failed to meet the heavy burden of establishing the grave risk defense by clear and convincing evidence.

**Discretion to Order Return**

37.     Having determined that the minor children are well-settled in their new environment, the Court must now consider whether to exercise its discretion under Article 18 of the Hague Convention and order the return of the minor children despite the fact that they are now well-settled in the United States. *de Silva*, 481 F.3d at 1285; *Danaipour v. McLarey*, 286 F.3d 1, 14 (1st Cir. 2002); *Miller*, 240 F.3d at 402.  Article 18 of the Hague Convention provides that "[t]he provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time." Hague Convention, art. 18.

38.     In his concurring opinion in *Lozano v. Montoya Alvarez*, 134 S.Ct. 1224, 1237 (2014), Justice Alito listed several factors that could outweigh the child's interest in remaining in his new environment: 1) the child's interest in returning to his or her original country of residence; 2) the child's need for contact with the non-abducting parent; 3) the non-abducting parent's interest in exercising custody to which he or she is legally entitled; 4) the need to discourage inequitable conduct (such as concealment) by abducting parents; and 5) the need to deter international abductions generally. *Lozano*, 134 S.Ct. at 1237.

39.     There was no evidence that Respondent attempted to conceal the minor children.  Petitioner does not dispute that he knew the probable location of the minor children as early as August 2013. Despite having that knowledge, Petitioner did not file the instant Hague Convention petition until October 27, 2014.

40.    The minor children's interest in returning to Mexico is not outweighed by their interest in remaining in the United States.  Although the Court overruled Respondent's mature child objection, F.C.G. objects to returning to Mexico.  There is strong evidence that the minor children are well-settled in their new environment.  F.C.G. and A.C.G. are acclimated to their new surroundings and, by all accounts, are thriving.  Since their arrival, both children have gained weight and are happy and healthy.  F.C.G. is doing well in school and has many friends.

41.    The minor children's need for contact with the Petitioner does not outweigh their interest in remaining in their new environment.  Likewise, Petitioner's interest in having his children returned to Mexico does not outweigh the children's interest in remaining in their current, stable environment.  Although Respondent's conduct in removing the children from Mexico was clearly contrary to the Hague Convention, her conduct does not justify the exercise of discretion to return the children.  There was no inequitable conduct such as concealment on Respondent's part.

42.    The Court's decision not to return the minor children to Mexico is not a custody determination; nor does it mean that Petitioner should not have contact with the minor children.  Rather, the Court's ruling is merely a decision that any custody determination should be made by a court in South Carolina, as opposed to one in Mexico. *See In re Lozano*, 809 F. Supp. 2d at 234-35.  Accordingly, the Court declines to exercise discretion to return the children under Article 18 of the Hague Convention.  F.C.G. and A.C.G. should not be returned to Mexico at this time and any custody arrangement between Petitioner and Respondent should be determined by a South Carolina court.

## Conclusion

For the reasons stated above, Petitioner has established a *prima facie* case of wrongful

removal under the Hague Convention.  Respondent, however, has established by a preponderance of the evidence that the minor children are well-settled in their new environment.  Respondent has failed to meet her burden of establishing the mature child objection or the grave risk defense.  The Court declines to exercise its discretion to order the minor children returned even though they are now well-settled.  Petitioner's verified petition for return of the minor children to Mexico under the Hague Convention [ECF #1] is **DENIED**.

**IT IS SO ORDERED**.

Florence, South Carolina
July 20, 2015

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge